**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ANTHONY JORDAN,

*Petitioner*,

v.

SSA TERMINALS, LLC; HOMEPORT INSURANCE CO.; DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS,

*Respondents.*

No. 19-70521

BRB No. 18-0476

OPINION

On Petition for Review of an Order of the Benefits Review Board

Argued and Submitted May 15, 2020
San Francisco, California

Filed August 28, 2020

Before: Ryan D. Nelson and Daniel A. Bress, Circuit Judges, and Frederic Block, District Judge.[*]

Opinion by Judge Block

---

[*] The Honorable Frederic Block, Senior United States District Judge for the Eastern District of New York, sitting by designation.

# SUMMARY[**]

**Longshore and Harbor Workers' Compensation Act**

The panel granted a claimant's petition for review of the Benefits Review Board's denial of his claim for disability benefits under the Longshore and Harbor Workers' Compensation Act; and remanded with instructions to the administrative law judge to apply the proper legal standard in assessing claimant's allegations of disabling pain.

The panel held, as a matter of first impression, that credible complaints of severe, persistent, and prolonged pain can establish a prima facie case of disability, even if the claimant can literally perform his or her past work. The panel held further that a claimant need not experience excruciating pain to be considered disabled.

The panel held that the ALJ's opinion as a whole suggested that the ALJ believed claimant had to establish that it was literally impossible for him to do his past work, and this was error.

The panel left it to the ALJ on remand to determine, based on consideration of all the facts and circumstances of the case, whether claimant's complaints of pain were (1) credible, and (2) if so, whether the level of pain was sufficiently severe, persistent, and prolonged to significantly interfere with the claimant's ability to do his or her past

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

work. The panel held that the pain must relate to an injury that arose out of and in the course of employment.

## COUNSEL

Michael Villeggiante Jr. (argued) and Philip R. Weltin, Weltin Streb & Weltin LLP, Oakland, California, for Petitioner.

Alan J. Chang (argued), Bruyneel Law Firm LLP, San Francisco, California, for Respondents.

## OPINION

BLOCK, District Judge:

Anthony Jordan petitions for review of the denial of his claim for disability benefits under the Longshore and Harbor Workers' Compensation Act ("LHWCA" or "the Act"), 33 U.S.C. §§ 901–50. Because the Administrative Law Judge ("ALJ") applied an improper legal standard in assessing Jordan's disability, we grant the petition and remand. We write principally to set forth the standards for evaluating pain under the Act.

## I

Jordan worked for SSA Terminals, LLC ("SSA"), as a longshoreman. Approximately 85% of the time, he was assigned to drive a heavy truck (called a "tractor") to move cargo containers around the terminal. Jordan also owned and operated a small landscaping business.

On September 17, 2014, the tractor Jordan was driving was lifted and dropped by a crane. He suffered extensive damage to his lower back, including herniated discs, stenosis and nerve impingement. He was initially treated with medication and physical therapy, but continued to complain of back pain and spasms, as well as pain and numbness in his legs. These symptoms reduced his mobility and made him prone to falling.

Jordan saw Dr. James Reynolds, a spine surgeon, on three occasions beginning in November 2015. Dr. Reynolds recommended spinal fusion surgery, which was successfully performed on March 28, 2018.

Several years before the surgery, Jordan filed a claim for benefits under the LHWCA with SSA and its insurer, Homeport Insurance Company ("Homeport"). SSA and Homeport agreed that Jordan was totally disabled immediately following the accident and again as he recovered from surgery.

At some point during the claim process, Homeport ordered surveillance of Jordan. The surveillance videos, recorded in January 2015 and between February and June 2016, showed Jordan lifting and carrying various objects; engaging in physical activities such as bending, tossing a baseball, and doing push-ups; and attending sporting events where he appeared to sit and stand for long periods without difficulty.

Presumably based on the videos, SSA and Homeport took the position that Jordan was able to perform his usual work for a period of time between his accident and his surgery. Accordingly, the claim was assigned to an administrative law judge to determine whether Jordan was disabled between April 14, 2016, and March 27, 2018.

## A. Testimony of Claimant and Treating Physician

The ALJ held an evidentiary hearing at which Jordan and Dr. Reynolds testified. Jordan testified, "There's nothing I can't do, but it all either is painful, elevates the pain, or I can't do it for the amount of time that would be considered a job." He further testified that his landscaping business required "[p]ushing a lawnmower, walking around with a blower, watering plants, some grooming, a lot of pointing, telling people what to do," as well as lifting "[m]aybe 35 pounds." Jordan continued to do landscaping work after his injury, but testified that it was "not at the capacity that [he] was." Instead of doing "every aspect of the job" as he did before, he was "more in the supervisor-type role" after his injury. He still did some physical tasks, but only "because [he had] no choice."

Dr. Reynolds corroborated Jordan's complaints of pain, testifying that MRIs revealed "modic changes," a condition "generally associated with a lot of back pain." Dr. Reynolds testified in particular that "bouncing around in a truck" would be "very painful" and "assume[d] it would accelerate the already significant degeneration that's present in the [lower back]." In sum, Dr. Reynolds opined that Jordan was totally disabled from work as a longshoreman, principally because he could not work "an eight-hour day in a regular fashion" and would have to "take breaks and do things to decrease the pressure on his back." He acknowledged that Jordan continued to work "about five hours a day" at his landscaping business, but "didn't discourage him from doing that" because he could "take breaks or lie down or lean against a wall."

Dr. Reynolds did not view the surveillance videos, but saw references to them in the reports of one of the non-treating physicians discussed below.

## B. Evidence from Non-Treating Physicians

The ALJ also received evidence in the form of the reports and depositions of three non-treating physicians retained to perform independent medical examinations: Dr. Yi Chiang, an osteopath; Dr. Charles Skomer, a neurologist; and Dr. Brian Su, an orthopedist.

Dr. Chiang saw Jordan on four occasions. At one point, Jordan asked Dr. Chiang to become his treating physician, but she declined. After the first three examinations, Dr. Chiang opined that Jordan was unable to work as a longshoreman; after the fourth, on February 26, 2016, she opined that he could return to work provided he did not need to bend at the waist more than 50% of the time, lift or carry greater than 20 pounds, or walk more than one hour at a time; she specifically opined that Jordan was "[a]ble to drive autos, cars, tractors." After viewing the surveillance videos, Dr. Chiang testified at a deposition that she would have said that Jordan could work without restrictions on February 26, 2016, because the videos showed him "surpassing those [restrictions] effortlessly."

Dr. Skomer examined Jordan on two occasions. After an examination on June 10, 2015, he opined that Jordan was totally temporarily disabled. After an examination on August 12, 2015, he opined that Jordan could perform "semi-sedentary" work for up to four hours a day, with "breaks for stretching" every 30 minutes. As with Dr. Chiang, Dr. Skomer changed his opinion after viewing the surveillance videos. In an October 2016 report, he stated that Jordan could perform his "normal employment full time, without restrictions," and that his prior opinions were "not valid or accurate" because it was not "reasonable" to conclude that Jordan "was experiencing lumbar and lower

extremity pain while able to perform the activities observed on the video tapes."

Dr. Su examined Jordan on October 6, 2017, and reviewed the reports of Drs. Chiang and Skomer, as well as the surveillance videos. He opined that the surveillance videos were inconsistent with Jordan's complaints of pain, and that he could "return to his job as a longshoreman." Since Dr. Su viewed the surveillance videos prior to preparing his report, there was no need for him to revise his opinions.

## C. Agency Decisions

The ALJ rendered his decision on May 29, 2018. He began by describing "the most difficult issue in this case" as "the difference between 'can' and 'cannot'":

> Mr. Jackson [sic] argues it may be literally true he "can" endure some level of physical exertion, but only at such a cost in extraordinary effort and suffering the court cannot fairly require it of him under the circumstances of this case. [SSA], by contrast, argues the court cannot rationally conclude Mr. Jordan "cannot" exert himself physically when he in fact does. Thus the court finds itself in the Twilight Zone separating difficulty from impossibility—the difference between "can" and "cannot."

The ALJ then summarized the evidence set forth above. He described Jordan's testimony that he could do anything he wanted, "but only with pain, and only for shorter periods than before the injury," as "unhelpful." He apparently did not accept SSA and Homeport's assertion that Jordan was

not credible, instead describing him as "focusing on the wrong question." In the ALJ's mind, the relevant question was "whether [Jordan's] remaining abilities would allow him to return to work." "On this point," the ALJ thought, "Mr. Jordan's testimony is, at best, ambiguous."

Turning to Dr. Reynolds, the ALJ described him as "well-qualified" and "credible." He nevertheless rejected his opinion that Jordan could not work as a longshoreman "for one reason only: he has never seen [the] surveillance footage." The ALJ stated that the difference between Jordan's self-described limitations and the activities shown in the videos was "striking, even to the untrained eye." Stressing the changed opinions of Drs. Chiang and Skomer, he further noted that the videos' "effect on the medical opinions in this case is remarkable."

The ALJ described Jordan's complaints of pain as "not wildly improbable" and acknowledged that "[a] lazier person in Mr. Jordan's position might well have simply stayed at home and made no effort to work after the accident." But the ALJ reasoned that "[i]f Mr. Jordan 'can' work, the Act presumes that he will, and denies him benefits," and that "if Mr. Jordan's financial needs compel him to work unwillingly, he has plenty of company in the workforce." Accordingly, the ALJ found that Jordan had not carried his burden of proving that he was totally disabled between April 14, 2016, and March 27, 2018.

Jordan appealed to the Benefits Review Board ("BRB"), which affirmed. It held that the ALJ (1) "rationally determined that [Jordan's] statements regarding his inability to return to work are not creditable" in light of the surveillance videos, and (2) "permissibly gave greater weight to the opinions of the physicians who viewed the

surveillance videos." Jordan timely petitioned for judicial review.

## II

The BRB must accept the ALJ's findings of fact unless they are "contrary to the law, irrational, or unsupported by substantial evidence." *Chugach Mgmt. Servs. v. Jetnil*, 863 F.3d 1168, 1173 (9th Cir. 2017). We then "conduct an independent review of the administrative record to determine if the Board adhered to this standard." *Stevedoring Servs. of Am. v. Price*, 382 F.3d 878, 883 (9th Cir. 2004). The interpretation of the LHWCA, by contrast, "is a question of law reviewed de novo and is not entitled to any special deference." *Id.*

Under the LHWCA, the employee has the initial burden of proving that "his work related injury prevented him from performing his former job." *Hairston v. Todd Shipyards Corp.*, 849 F.2d 1194, 1196 (9th Cir. 1988). The burden then shifts to the employer to prove "that suitable alternate work was available in the community." *Id.*

### A. Pain and Disability

The central issue in this case is whether Jordan's complaints of pain described a covered disability. The LHWCA defines "disability" as the "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment." 33 U.S.C. § 902(10).

We have occasionally alluded to the effect of pain on a claimant's ability to do work and earn wages. The claimant in *Carrion v. SSA Marine Terminals, LLC*, 821 F.3d 1168 (9th Cir. 2016), for example, "had endured decades of

persistent [knee] pain without any actual or expected improvement." *Id.* at 1170. We said that "[w]ithout doubt, he is disabled." *Id.* In *Container Stevedoring Co. v. Director, Office of Workers Compensation Programs*, 935 F.2d 1544 (9th Cir. 1991), we upheld the ALJ's finding that the claimant's post-injury wages did not reflect his earning capacity because he was able to work after his injury only with "pain and limitations." *Id.* at 1550.

Other circuit courts have been more explicit that pain can be disabling. *See, e.g.*, *Bath Iron Works Corp. v. White*, 584 F.2d 569, 575 (1st Cir. 1978) ("[A]n employee need not be in pain, nor is he required, after injury, to continue in employment which is medically contraindicated until his condition and pain render it impossible for him to work at all."). Perhaps the clearest statement comes from the Fifth Circuit: "Even if able to work, [a claimant] may be found to be totally disabled if he is working with extraordinary effort and in excruciating pain." *La. Ins. Guar. Ass'n v. Bunol*, 211 F.3d 294, 297 (5th Cir. 2000). The BRB has itself endorsed a virtually identical formulation: "An employee may be found to be totally disabled despite continued employment if he works only through extraordinary effort and in spite of excruciating pain, or is provided a position only through employer's beneficence." *Ramirez v. Sea-Land Servs., Inc.*, 33 BRBS 41, 1999 WL 284793, at *5 (BRB Apr. 20, 1999); *see also Haughton Elevator Co. v. Lewis*, 572 F.2d 447, 451 (4th Cir. 1978) (Winter, J., concurring) ("I agree with the Board that 'it would be unfair to penalize [the claimant] by denying him compensation for permanent total disability because he made an extraordinary effort to keep working" and that a man "having a severe physical disability as a result of an employment-related injury should not be required to continue enduring

excruciating pain and subjecting himself to the possibility of further injury . . . .").

SSA and Homeport do not dispute the idea that pain can be disabling, but point out that the complaints of pain must be credible. We agree.

We hold, as a matter of first impression, that credible complaints of severe, persistent, and prolonged pain can establish a prima facie case of disability, even if the claimant can literally perform his or her past work. *See, e.g.*, *Bunol*, 211 F.3d at 297.

Our holding should not be taken to mean that any amount of pain is per se disabling. As the Sixth Circuit observed in *Paducah Marine Ways v. Thompson*, 82 F.3d 130 (6th Cir. 1996), there are some "aches and pains that are not disabling and thus not compensable" under the LHWCA. *Id.* at 134. Even judges must endure some degree of physical discomfort inherent in their work.

On the other hand, a claimant need not experience excruciating pain to be considered disabled. According to one reputable dictionary, "excruciating" is defined as "so intense as to cause great pain or anguish," Webster's Third New International Dictionary 794 (2002), and is synonymous with "agonizing, harrowing, racking, raging, tormenting, torturing, torturous [and] wrenching," Merriam-Webster Online, https://merriam-webster.com/dictionary/ excruciating (last visited Aug. 21, 2020). Torture should not be the benchmark for disability under the LHWCA, a statute which "is to be liberally construed in favor of injured employees." *Saipan Stevedore Co. v. Dir., Office of Workers' Comp. Programs*, 133 F.3d 717, 722 (9th Cir. 1998) (citing *Voris v. Eikel*, 346 U.S. 328, 333 (1953)).

Moreover, although the Fifth Circuit and the BRB have made reference to the term, neither has suggested that "excruciating" is the threshold for disabling pain. Both the circuit court and the agency simply rejected the proposition that continued employment precluded a finding of disability in the face of evidence that the work subjected the claimant to such extreme pain. *See Bunol*, 211 F.3d at 297; *Ramirez*, 1999 WL 284793, at *5 n.5. Indeed, the Fifth Circuit has elsewhere acknowledged that the LHWCA does not "require[] that a longshoreman be bed-ridden before he is considered totally disabled." *Watson v. Gulf Stevedore Corp.*, 400 F.2d 649, 654 (5th Cir. 1968); *see also John W. McGrath Corp. v. Hughes*, 289 F.2d 403, 405 (2d Cir. 1961) (noting that, under the LHWCA, "[a] person may be permanently totally disabled in an economic sense and still be ambulatory").

Between the poles of "any" pain (which is not sufficient), *see Paducah Marine Ways*, 82 F.3d at 134, and "excruciating" pain (which is not necessary to show), *see Bunol*, 211 F.3d at 297, lies a considerable range. There is, in other words, a vast middle ground between occasional discomfort and torture. Although the cases have not clearly identified the quantum of pain that is sufficient to create a disability under the LHWCA, the statute's definition of "disability" and the case law in this area support our holding that the level of pain must be sufficiently severe, persistent, and prolonged to significantly interfere with the claimant's ability to do his or her past work. *See id.* (upholding disability benefits based on testimony that the claimant worked only with "substantial" and "constant pain"); *see also Mijangos v. Avondale Shipyards, Inc.*, 948 F.2d 941, 944–45 (5th Cir. 1991) (reinstating disability award when "there was much expert testimony indicating that [the claimant] could physically perform certain jobs" but "[t]here

was also testimony indicating that [the claimant] would have constant pain in any of these jobs"); *see also Nardella v. Campbell Mach., Inc.*, 525 F.2d 46, 49 (9th Cir. 1975) ("Even a relatively minor injury must lead to a finding of total disability if it prevents the employee from engaging in the only type of gainful employment for which he is qualified.").

We leave it to ALJs to determine, based on consideration of all the facts and circumstances of a particular case, whether a claimant's complaints of pain are (1) credible and (2) if so, whether the level of pain described is so severe, persistent, and prolonged that it significantly interferes with the claimant's ability to do his or her past work. Although we do not attempt an across-the-board definition of disabling pain, we offer the following guideposts.

First, the pain must relate to an injury "arising out of and in the course of employment." 33 U.S.C. § 902(2); *see also Kalama Servs., Inc. v. Office of Workers' Comp. Programs*, 354 F.3d 1085, 1091 (9th Cir. 2004). Pain unrelated to such an injury will not suffice.

In addition, the pain must be sufficiently severe, persistent, and prolonged to adversely impact the claimant's ability to do his or her job in some significant way. This certainly includes impossibility; an injury might make an activity so painful that the employee literally cannot do it, "render[ing] it impossible for him to work at all." *See White*, 584 F.2d at 575. It would also cover a situation in which the employee can perform a task only by enduring extreme or "excruciating" pain. *Bunol*, 211 F.3d at 297. But it might also impact the employee's ability to perform the activity over a full workday. *See Eller & Co. v. Golden*, 620 F.2d 71, 72 (5th Cir. 1980) (upholding a disability benefits award when, among other things, the claimant credibly testified

that he could "not continue to work beyond four hours due to pain in his lower back and the 'giving way' of his left knee which caused him to fall when he attempted to lift cargo"). Or it might simply cause the severe, persistent, and prolonged pain that would make a reasonable employee stop doing the activity. *See Bunol*, 211 F.3d at 297 (upholding disability benefits based on "substantial" and "constant pain"); *Mijangos*, 948 F.2d at 944–45 (5th Cir. 1991) (reinstating disability award based on "constant pain"). In other words, whatever the level of pain, the employee need not make an "extraordinary effort" to overcome it and should not be penalized if he or she does so. *Bunol*, 211 F.3d at 297.

Relatedly, and although somewhat distinct from the issue of the required quantum of pain, an employee need not perform work that, according to the medical evidence, will exacerbate his or her injury to a degree that significantly impedes the claimant's ability to perform his or her past work. As the First Circuit explained in *Bath Iron Works*, a claimant is not "required, after injury, to continue in employment which is medically contraindicated until his condition and pain render it impossible for him to work at all." 584 F.2d at 575; *see also Container Stevedoring*, 935 F.2d at 1550 (upholding an award of disability benefits based in part on a treating physician's view that continuing to work would "lead to worsening symptoms and worsening disability" for the claimant) (quotations omitted); *Haughton Elevator Co.*, 572 F.2d at 451 (Winter, J., concurring) (agreeing that, under the LHWCA, a claimant "should not be required to continue enduring excruciating pain and subjecting himself to the possibility of further injury"); *Care v. Wa. Metro. Area Transit Auth.*, 21 BRBS 248, 251 (1988) ("A doctor's opinion that [a claimant's] return to his usual work would aggravate his condition may support a finding of total disability."); *Lobue v. Army & Air Force Exch. Serv.*,

15 BRBS 407, 408–09 (1983) (affirming an ALJ's finding that the claimant was disabled based on a physician's statement that continued work would "aggravate" the claimant's spondylolisthesis); *cf. Haw. Stevedores, Inc. v. Ogawa*, 608 F.3d 642, 653 (9th Cir. 2010) (affirming ALJ's consideration of work restrictions that would allow claimant to "avert more pronounced cognitive difficulties").

## B.  Application

The ALJ in this case framed his analysis as an inquiry into the difference between "difficulty" and "impossibility," or between "can" and "cannot."  As we explained above, our answer to that inquiry is that disability does not mean that it is completely impossible for the claimant to do his or her past work.  Our review of the ALJ's decision indicates that he applied an improperly high standard to Jordan's claim.

First, in the ALJ's view, SSA and Homeport argued that "the court cannot rationally conclude Mr. Jordan 'cannot' exert himself physically when in fact he does."  That he found in favor of SSA and Homeport implies, absent any indication to the contrary, that he adopted the impossibility standard he said they advocated.

Second, the ALJ described Jordan's testimony about his pain as "unhelpful," "focused on the wrong question," and "at best, ambiguous."  To the contrary, Jordan relevantly and unambiguously testified that he could do anything he wanted to, but "it all either is painful, elevates the pain, or I can't do it for the amount of time that would be considered a job."  If the ALJ did not believe that testimony, he could have said so.  Instead, he described Jordan as "human" and "hardly unusual."  Such descriptions shed no light on the ALJ's view of Jordan's credibility.  Instead, and notwithstanding the ALJ's apparent reliance on the opinions of the different

physicians and the surveillance video footage of Jordan, the ALJ's opinion as a whole suggests that the ALJ believed Jordan had to establish that it was literally impossible for him to do his past work.  That was error.[1]

Therefore, we remand to the BRB with instructions to remand to the ALJ.  On remand, the ALJ must first determine whether Jordan's complaints of pain were credible.  If so, then the ALJ must decide whether the pain described significantly affected Jordan's ability to do his past work in the manner we have described in this opinion.  If the ALJ finds Jordan's complaints of pain *not* credible, then they need not be taken into account.

## C.  Other Issues

Jordan makes two additional claims of error.  First, he argues that the ALJ's decision to credit the opinions of the non-treating physicians over those of Dr. Reynolds was irrational.[2]  Second, he argues that the surveillance videos alone are not substantial evidence of his ability to work.

---

[1] The BRB described the ALJ's decision as a "rational[] determin[ation]" that Jordan's testimony about his limitations were "not creditable."  Unlike many final administrative decisionmakers, the BRB is not free to reach an independent conclusion; its review of the ALJ's decision is limited by the "substantial evidence" standard. *See Chiguch*, 863 F.3d at 1173.  We therefore do not defer to the BRB's description of the ALJ's decision.

[2] As in Social Security cases, the opinions of treating physicians in LHWCA cases are "entitled to special weight."  *Amos v. Dir., Office of Workers Comp. Programs*, 153 F.3d 1051, 1054 (9th Cir. 1998). However, that deference is given because a treating physician "has a greater opportunity to know and observe the patient as an individual." *Id.* (quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

Both those issues are potentially relevant to Jordan's credibility regarding his pain. Jordan's self-described pain was corroborated by Dr. Reynolds but called into question by the non-treating physicians. The surveillance videos show Jordan engaged in activities arguably inconsistent with his description of his limitations.

In addition to whatever independent evidentiary weight they might have, the surveillance videos provided a basis from which the medical experts could draw inferences regarding Jordan's ability to work full-time as a longshoreman. The ALJ can give those inferences the weight he thinks they deserve. Indeed, we expect that the ALJ will consider all the evidence—Jordan's testimony, the opinions of treating and non-treating physicians, and the surveillance videos—in deciding whether Jordan's complaints of pain are credible, and if so, whether that pain significantly impacted his ability to do his past work.

## III

Jordan's petition for review is **GRANTED**. The matter is **REMANDED** to the BRB with instructions to remand to the ALJ for further proceedings consistent with this opinion.

---

Here, Dr. Reynolds saw Jordan on only three occasions, while Dr. Chiang saw him four times. Jordan does not argue that Dr. Reynolds's status as a treating physician entitled his opinion to any particular deference.